# 15-88

In The

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

MAZHAR SALEEM, Individually and on behalf of all others similarly situated, JAGJIT SINGH, Individually and on behalf of all others similarly situated, ANJUM ALI, MALOOK SINGH, CARLOTA BRIONES, JAIRO BAUTISTA, JOSE CABRERA, MARLENE PINEDO, MIRIAM SOLORZANO, MOHAMMAD MIAN, MOHAMMAD SIDDIQUI, S. PEDRO DUMAN, RAJAN KAPOOR, WILMAN MARTINEZ, JOSE SOLORZANO, LUIS A. PEREZ, RANJIT S. BHULLAR, LUIS M. SANCHEZ, ANWAR BHATTI, AVNEET KOURA, MAHER MAQSOOD, ATIF RAZAQ, BHAVESH SHAH, KHUSHWANT SINGH, JAMSHED CHOUDHRY, AZIZ URREHMAN, HASAN KHALBASH, PETER PANZICA, ROBINSON MATA, HILARIO A. SANCHEZ, MANSOR AHMED RANA, BAUDWIN KOURI, ALEXIS S. GACIA-ALBERTO, MUHAMMAD I. CHOUDHRY, ANA M. HERRA, MARISOL ESPINAL, WALID HAMEHO, ALEXANDER SCHWALLB, ERIC JARMON, KEITH DANIEL, RAFAEL RIJO, BABAB HAFEEZ, NORMAN LEVINE, MARIO GUERRERO

*(Caption Continued on Inside Cover)*

On Appeal from the United States District Court
For the Southern District of New York

## BRIEF FOR *AMICUS CURIAE* BLACK CAR ASSISTANCE CORPORATION IN SUPPORT OF DEFENDANTS-APPELLEES SUPPORTING AFFIRMANCE

Schlam Stone & Dolan LLP
*Attorneys for Amicus Curiae*
*Black Car Assistance Corporation*
26 Broadway
New York, New York 10004
(212) 344-5400

Press of Fremont Payne, Inc. · 55 Broad Street, Third Floor, New York, NY 10004 · (212) 966-6570

BATANTA, LIANG HUA MA, WILLIAM MARTINEZ, MOHAMMED A. MUSA, KERRY BOBB, HARJAR RAHMAN, ELPIDIO HELENA, TAMER RASHDAN, MENA MICHAEL, FELIX L. CARABALLO, MARK SHINDER, JOHN M. HIDALGO, ODISHI, INC., KIRK HAYDEN, BARTOLOME ROSARIO, LUIS VASQUEZ, IRFAN SHAFI, MOHAMMAD A. SIDDIQUI, WADE QUASHIE, JIMMY CHEN, JEFF M. GRAVESANDE, EDISSON BARROS, ANDRZEJ OLECHNOWICZ, NICK WIJESINGHE, (POINT TO POINT CAR & LIMO INC.), JACK GOLDEN, FIROZ AHMED, PAUL GLIBAUSKAS, FELIX A. PAULINO, JUAN DE LOS SANTOS, CHOWDHURY ANOWAR, ZONG RONG ZHU, MOHAMMED GAZI ALI, MEI YAO LIU, KATELYN SANTOS, JOSE JAIMES, IBRAHIM DESOOKI, DONGSEDG YOO, JORGE MONAKS, MALIK HUSSAIN, MARCOS MENDEZ, LUIS AUCAPINA, ANDERSON GONZALEZ, TOWON STEWART, FERAS ISSA, LENKIN PANTALEON, EDGAR AUCAPINA, CELSTINO MONTERO, MIKHAIL GERBER, ZYDAN ELNAHAR, DEXTER PUSEY, RANGDEU MULTANI, SATNAM SINGH, XIANGBO LI, HUANG XIONG JIE, RAFAEL A. RISO, ISMAEL MEJIA, KULDIP SINGH, JAN A. KALDA, JEEWAN SINAH, WILSON A. SANTOS, SOHAN SINGH GILL, EUCLIDES PENA, LESTER C. MCDONALD, NORMAN HO, GENNADI PETROVSKI, SATNAM SINGH, ZENXIN WANG, NOBLE YOUNG, FRANCOIS FAN-FAN, MUHAMMAD I. CHOUDHRY, FABIAN MARTINEZ, KONSTANTIN KATZ, RAFAEL OSORIA, NWALA GABRIEL, JOSE M. SOLORZANO, UBALDO DE LOS SANTOS, HARRIKISSOON SEEJATTAN, HARJAR RAHMAN, ADEL ELKAZAZ, PEDRO M. PIASENCIA, KHORSHED ALAM, GARNELL WRIGHTEN, REFAT BHUIYAN, LEO K. STEWART, JEFF M. GRAVESANDE, AHMED NISAR, DANJIT SINGH, HUMAYUN KABIR HUSSAIN, MOHAMMED A. MUSA, HARNEK SINGH WHAR, SHASHI BHATIA, GOGINDER SINGH, ABDELILAH ELKARHAT, MANINDER SINGH, JO GINDER-SINGH, WILMAN MARTINEZ, HARVINDER KHAMRA, DAVID A. SANCHEZ, SYED FIROZUDDIN, DARIUSZ RYDZEWSKI, YASAR KAHRAMAN, ALI GAZI MOHAMMED, AHMED M. BAKIER, ONRIS DE LA ROSA, HARVINDER S. BHAMRA, IMTIAZ H. QUERESHI, DAMIR, AHMED ISMAIL, MUNISH KUMAR, PAUL GLADKEVITCH, TARLOCMAN PAL SINGH, (T.P.), ADAM KLAG, AL WONG ZHANG, MUSTAPHA RAHMOUWI, MAHAMMAD ALI SIDDIQUE, SHENG ZHANG LU, GUSTAVO GARCIA, ASHWIN KUMAR, INDERJIT SINGH, MAN CHENG, BALWINDER SINGH, JAWAID KAYANI, SUKHDEV SINGH, FERNANDO AVENDANO, XIONG WEI MI, MOHAMMAD ISLAM, DONGSEOG YOU, TAOJOCHAN SIHGH, RATIC SHIVIONOV, JAGDISH KAL, GABRIEL PIZHA, ANOMWAR I. CHOWDHURY, SAMSON LIAU, NESTOR TERAN, RAJAN DODEJA, SOCRATES GREGORIADIS, SAAD ATTIA, ANTHONY KHAN, RAMON A. ALMONTE, BADLANI PRAKASH, JUAN A. SOTO, MUNJED SHABANEH, JOSE SOLORE, JOSE M.S., ROXANA A. ZETINO, IRFAN SHAFI, ARCELIA BARROS, CHEUNG YEUNG, POINT

*(Caption Continued on Following Page)*

TO POINT CAR & LIMO, INC., VISHAMBER TUKREL, YING TIAN LEI, MIKHAIL ZEMKO, TAHIR AZIZ, WEN ZHONG LI, KE GENG SHI, N. WESESINGHE, CHRISTINA SANCHEZ MONTERO, KULYK OLEG, ARIEL RESTITUYO, SHUHRAT KHAKBERDIYER, ANGEL M. GAYA, BAYRAM ONBASI, JORGE CONTRERAS, JUAN C. MOGROVEJO, XUN LI FAN, SAMEH S. BASILY, JOSE PINTO, RAMADAN S. KENAWI, DONAVAN JAMES, IBRAHIM ONBASI, AMANDA SINGH, SULEYMAN ISSI, WAZIR MUGHAL, ETIENNE TCHITCHUI, DIOGENES PION, IJAZ MAHBOOB, PEDRO PAZMINO, JING JING WANG, AZID RIAZ, GURMAIL SINGH, ASAND FARA, LAWRENCE CALLISTE, GUO BAO XUAM, JEETU MULTANI, KING WAH YIU, ANJUM ALI, GURMAIL SINGH, AHMED ALJAHMI, BUO XUAN GUO, AMERICAN CAR LIMO TOURS, INC., MOHAMED ABDELAAL, KHEMLHAND KALIKA, MUNISH KUMAR, SHAHIDULLAH DULAL,

*Plaintiffs-Appellants,*

*- against -*

CORPORATE TRANSPORTATION GROUP, LTD., CORPORATE TRANSPORTATION GROUP INTERNATIONAL, CORPORATE TRANSPORTATION GROUP WORLDWIDE, INC., NYC 2-WAY INTERNATIONAL, LTD., ALLSTATE CAR & LIMOUSINE, INC., ARISTA CAR & LIMOUSINE, LTD., TWR CAR & LIMOUSINE SERVICE, LTD., EXCEL-SIOR CAR AND LIMOUSINE, INC., HYBRID LIMO EXPRESS, INC., EDUARD SLININ, GALINA SLININ,

*Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, proposed Amicus Curiae Black Car Assistance Corporation certifies that it is a not-for-profit corporation that has no outstanding stock, and consequently, that no parent corporation or publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................iii-v

INTERESTS OF *AMICUS CURIAE* ....................................................1

Preliminary Statement........................................................................4

ARGUMENT ......................................................................................6

POINT I.............................................................................................6

BLACK CAR DRIVERS HAVE CHOSEN TO BE INDEPENDENT
CONTRACTORS SINCE THE BLACK CAR INDUSTRY WAS BORN IN THE
EARLY 1980s.....................................................................................6

    A.    The Black Car Industry Grew Out Of Voluntary Associations
           Of Independent Taxi Drivers................................................6

           1.  Taxi Drivers Prove Reluctant To Give Up Their Radio
                Business......................................................................7

           2.  The TLC Mandates Separation Of The Radio Dispatch From
                The Taxi Business .......................................................9

    B.    The Drivers That Affiliated With Radio Dispatch Bases Remained
           Independent Contractors ......................................................9

    C.    Drivers Who Wish To Be Employees Can Drive For The Livery Or
           Limousine Industry...........................................................13

POINT II .........................................................................................14

DEEMING BLACK CAR DRIVERS EMPLOYEES OF THE DISPATCH
BASES WOULD DESTROY THE BLACK CAR INDUSTRY...........................14

    A.    The Industry Has Relied On The Universal Recognition Of Black
           Car Drivers As Independent Contractors .............................14

           1.  New York State Department Of Labor .........................15

           2.  Taxing Authorities ....................................................16

i

           a.  Internal Revenue Service ....................................................16

           b.  New York State Department Of Taxation And Finance .....17

      3.  Workers' Compensation....................................................18

      4.  Franchise Law -- New York State Attorney General....................18

      5.  Unemployment Benefits -- Administrative and Judicial
          Interpretations...................................................................19

      6.  Tort Law -- Car Accident Context ...................................21

B.     The Industry's Longstanding Business Model Cannot
       Accommodate An Employer/Employee Relationship Between
       Base And Driver....................................................................22

      1.  Ending Drivers' Independence Will Upend If Not Destroy The
          Industry.............................................................................22

      2.  The Drivers Will Lose Their Businesses……………………… 24

CONCLUSION .....................................................................................27

ii

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Abouzeid v. Grgas,*
295 A.D.2d 376, 743 N.Y.S.2d 165 *(*2d Dept. 2002)..........................................21

*Anwar v. Transportation Systems, Inc.*,
SDNY Civil Action No. 13 Civ 2666 (GHW) .............................................. 24, 25

*Barak v. Chen,*
87 A.D.3d 955, 929 N.Y.S.2d 315 (2nd Dept. 2011)..........................................21

*Chaouni v. Ali,*
105 A.D.3d 424, 963 N.Y.S.2d 27 (1st Dept. 2013) ..........................................21

*Holcomb v. TWR Express, Inc.,*
11 A.D.3d 513, 782 N.Y.S.2d 840 (2d Dept. 2004)...........................................22

*Irrutia v. Terrero & Corona Car Service Corp.,*
227 A.D.2d 380, 642 N.Y.S.2d 328 (2d Dept. 1996)..........................................21

*Kuchinski v. Charge & Ride,*
21 A.D.3d 1062, 803 N.Y.S.2d 596 (2d Dept. 2005)..........................................22

*Matter of Arrow Transp.*,
ALJ Case No. 004-18884 (Unemployment Insur. Appeal Bd.,
ALJ Section 2005) ...................................................................................20

*Matter of Bishai* [Tel-A-Car],
208 A.D.2d 1103, 617 N.Y.S.2d 548 (3d Dept. 1994).......................................20

*Matter of Jarzabek* [Carey Limo],
292 A.D.2d 668, 738 N.Y.S.2d 742 (3d Dept. 2002)..........................................20

*Matter of Nite Riders Group, Inc.*,
ALJ Case No. 006-15485 (Unemployment Insur. Appeal Bd.,
ALJ Section 2007) ...................................................................................20

*Matter of Pavan* [UTOG 2-Way Radio Assoc.],
   173 A.D.2d 1036 (3d Dept. 1991), *rev'g*, A.B. 391, 945 (1991) .................. 19-20

*Matter of Rukh* [Battery City Car & Limo],
   208 A.D.2d 1105 (3d Dept. 1994) ....................................................................... 20

*Pinto v. TWR Express Corp.,*
   22 A.D.3d 481, 803 N.Y.S.2d 640 (2d Dept. 2005) ............................................ 21

*Wilson v. Kelleher Motor Freight Lines, Inc.*,
   12 N.J. Super. 261 (1953) .................................................................................... 22

## STATUTES, RULES, AND OTHER AUTHORITIES

New York General Business Law § 681(3) ............................................................ 12

New York Tax Law
   Section 1105(b) .................................................................................................... 18

New York Workers' Compensation Law § 2(3) ................................................... 18

New York Taxi & Limousine Commission Rules
   § 59A-03(c) ........................................................................................................... 11
   § 59A-03(k) ....................................................................................................... 12-13

Black Car Assistance Corporation*, Smartphone Apps:  Nothing New in New York's
   Taxi History* ......................................................(August 20, 2012), available at
   http://static.ow.ly/docs/bcac_whitepaper_taxiapps_ZlW.pdf .................. 6, 7, 8, 9

Internal Revenue Service*, Employment Tax Procedures:  Classification of Workers
   Within the Limousine Industry* (March 13, 1997), available at
   http://www.irs.gov/pub/irs-utl/limo.pdf ....................................................... 16-17

New York State Department of Labor, *Limousine Drivers -- Narratives & Pointers*
   (Dec. 21, 2009) ..................................................................................................... 15

**BRIEF FOR BLACK CAR ASSISTANCE CORPORATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

**INTERESTS OF *AMICUS CURIAE*[1]**

The Black Car Assistance Corporation ("BCAC") respectfully submits this *amicus* brief in support of Appellees, companies and individuals that (i) own and operate black car bases, or (ii) own and operate companies that provide administrative support services for black car bases. The purpose of this brief is to provide the Court with a history of the black car industry in New York City, and to explain how the current relationship between bases and their affiliated drivers grew organically from taxi drivers' formation of radio dispatch bases, through which they could serve customers by pre-arrangement to supplement their exclusive right to pick up street hails. For more than 30 years, judicial and regulatory rulings have supported the independent relationship between drivers and bases that grew out of the industry's historical roots. This brief also seeks to explain why this business model is incompatible with an employer-employee relationship between bases and drivers.

---

[1] BCAC states that no counsel for a party authored this brief in whole or in part, and that no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than BCAC and its counsel made a monetary contribution intended to fund the preparation or submission of this brief. By its accompanying motion, BCAC is seeking leave of the Court to file this brief.

A "black car" base is one of three categories of for-hire vehicle dispatch bases licensed by the New York City Taxi and Limousine Commission ("TLC"), the regulatory agency charged with overseeing the for-hire vehicle industry in New York City. The other two categories of for-hire dispatch bases are livery bases and luxury limousine bases.

The black car industry principally serves business clients, which establish accounts with the base. Trips often start or end at the office or are otherwise business related, and fares are paid using vouchers (or credit cards) linked to the customer's account. In contrast, the livery car industry principally serves individuals, who need not have an account to use the service and pay by cash or credit card, and provides mostly local trips within the borough in which the base is located. The Luxury Limousine industry serves a mix of business and individual customers.

BCAC is a not-for-profit corporation organized under New York law, and serves as a trade association and leading advocate for black car bases in New York. Formed in 1991, it consists of approximately 25 member companies ("Dispatch Bases"), which collectively dispatch approximately 5,200 drivers daily in the New York City metropolitan area. BCAC was founded principally for the purpose of helping to devise a system of workers' compensation insurance for the drivers of its member companies. Following a nine-year effort by BCAC and others, the New York Legislature created the New York Black Car Operators' Injury Compensation

2

Fund (known colloquially as the Black Car Fund) to provide workers' compensation coverage for Black Car drivers in New York State. The statute was signed into law by Governor George Pataki in May 1999, and is codified as New York Executive Law Article 6-F. The Black Car Fund today has approximately 250 member bases state wide, through which more than 19,000 affiliated drivers receive workers' compensation coverage.

In subsequent years, BCAC has advocated for and helped develop other legislation important to the black car industry, forged relationships with Taxicab & Limousine Commissions around New York State, and worked with the TLCs on initiatives to, among other things, increase accessibility for disabled customers, enhance drivers' ability to service customers at the airports, and limit regulation believed to be excessively burdensome for drivers and Dispatch Bases.

BCAC has a strong interest in seeing that the classification of black car drivers accords with economic reality, comports with the legal regime on which industry participants have relied to build their respective businesses, and advances the interests of its members, their customers and drivers. As described below, black car drivers have been independent business owners since the birth of the industry in New York City in the early 1980s. This status derives from the industry's roots in the taxicab industry, and is fundamental to the successful functioning of the industry— so much so that the TLC adopted it as the defining characteristic of the black car

industry in New York City, as distinct from the livery and limousine industries. State and federal law in every regulatory context recognizes the drivers as independent contractors, and both the drivers and Dispatch Bases have structured their investments based on this legally supported relationship. A holding by this Court that drivers, who paid tens of thousands of dollars to buy franchises, are legally employees, not business owners, would unravel the black car industry as it exists today, to the detriment of customers, drivers/franchise owners, and BCAC's member companies.

## Preliminary Statement

The business model of the black car industry is unique among the car service alternatives available to New Yorkers, because the drivers are business owners and, as owners, are personally invested in the service they provide. Drivers purchase a franchise from or shares in a black car base, and that ownership interest entitles them to receive dispatches from the base directing them to customers seeking transportation. The rights and obligations between the drivers and the base are set forth in a franchise agreement (in the case of a franchise structure) or proprietary license (in the case of a shareholder/license structure). These contracts (i) place no restrictions on how much (or little) or when the driver can work, (ii) entitle the driver to the proceeds of the fare minus a percentage service fee withheld by the base as payment for the administrative services provided by the base, and (iii) place no

restriction on the driver's right to perform work for his own account or for other Dispatch Bases. The industry has functioned on this business model since the beginning, and regulatory standards and tribunals have continuously and universally affirmed the arrangement. Thus, from their inception more than 30 years ago as dispatch facilities created by drivers, black car bases have always had an independent relationship with their affiliated drivers. Far from being artificial or manipulative in any sense, that independence is the central element of the relationship from which the legal duties and obligations between drivers and base have grown.

Superimposing an employee-employer relationship on this business model would so fundamentally alter the economics of the driver-base relationship that the industry could hardly continue to exist in its current form. Drivers might find the pay insufficient, and bases might find the overhead crushing. Whether each side to the contractual relationship would find enough of an upside to remain in the business is an unknown.

# ARGUMENT

## POINT I

## BLACK CAR DRIVERS HAVE CHOSEN TO BE INDEPENDENT CONTRACTORS SINCE THE BLACK CAR INDUSTRY WAS BORN IN THE EARLY 1980s

### A. The Black Car Industry Grew Out Of Voluntary Associations Of Independent Taxi Drivers

The black car industry grew out of taxi drivers' voluntary association with radio dispatch bases, through which they could service customers on a pre-arranged basis as an alternative to picking up street hails.[2]

In 1981, almost one-third of New York's 11,787 medallion taxis had two-way radios. Taxi drivers favored radio work because it gave them a regular flow of business and, in the drivers' view, posed less of a safety risk than street hails. To facilitate growth of the radio-based business, independent owner-operators of taxicabs got together and formed co-ops in the boroughs, which allowed passengers to call a central location and have a cab dispatched. This made available potentially hundreds of cabs for any given passenger. The TLC soon required those central dispatch bases to be licensed by the agency.

While that arrangement had obvious benefits for the drivers seeking radio

---

[2] The history that follows is taken from a BCAC publication entitled *Smartphone Apps: Nothing New in New York's Taxi History*, dated August 20, 2012 (hereafter, "*Taxi History*"), which includes as exhibits the primary source documents. It is available at http://static.ow.ly/docs/bcac_whitepaper_taxiapps_ZlW.pdf.

work, it had an adverse impact on the public. In particular, people seeking to hail a cab on the street grew increasingly frustrated at their inability to get a cab, as those cabs passed them by on their way to pick-up a passenger by pre-arrangement through the radio network. In March 1981 Mayor Koch appointed a 12-member committee, known as the Mayor's Committee on Taxi Regulatory Issues (the "Smith Committee"), to examine issues plaguing New York's taxi industry. In a Preliminary Issues Paper issued in October 1981, the Smith Committee took note of the frustration of customers wishing to hail a taxi arising "from the fact that radio calls divert a fixed supply of medallion cabs away from street hails," particularly when the customer sees "empty cabs with lit 'on-radio-call' signs either parked in line or passing on the street," or cabs parked "out of service in certain locations, with or without their radio call light turned on, in order to be free to respond to radio calls." *Taxi History*, at 4 and Exh. 7, page 70.

### 1. Taxi Drivers Prove Reluctant To Give Up Their Radio Business

The TLC's initial solution for freeing up  medallion cabs for street hails was to permit—but not require—cab drivers participating in the radio dispatch system to use their radios in non-medallion cars. Thus was the "black car" industry born. This February 1982 rule, however, which allowed the 3,200 medallion taxi owners belonging to two-way radio dispatch associations to transfer their radios to non-medallion vehicles, was voluntary. If a medallion driver wanted to continue

accepting radio dispatch customers, no regulation prohibited him from doing so.

It would be several more years before the TLC forcibly separated the taxi from the radio-dispatch industry. In November 1982 the TLC announced that 500 radio cabs were converted from radio duty to exclusive street hail service and that another 500 to 700 more medallion radio cabs would be restricted to hail service in the "immediate future" in order to address the shortage of taxi service due to radio calls. In the meantime, radio associations continued to be required to have a base license from the TLC.

At the end of 1984, the *New York Times* editorialized repeatedly that the TLC's approach was not producing results. In November 1984 the *Times* complained that the "transfer of radios from licensed taxis to other cars has slowed to a trickle in recent months. Owners of the surviving 2,000 radio taxis apparently find it more lucrative to work both sides of the street, responding to radio calls at rush hour and cruising for fares at less busy times." *Taxi History*, at 5 and Exh. 13. In December 1984 the Times again complained about the lack of TLC progress toward

> the promised disappearance of the flashing 'on radio call' signs by which so many yellow cabs snub riders, especially in rush hours. The commission has been allowing taxi owners to run a full-time radio car for every radio removed from a yellow cab. And now it intends to retire the remaining 2,000 radios 'by attrition'. . . . [S]uch attrition would not relieve the desperate shortage of medallion taxis for many years.

8

*Taxi History*, at 5-6, and Exh. 14.

## 2. The TLC Mandates Separation Of The Radio Dispatch From The Taxi Business

The TLC finally abandoned the voluntary approach, and on February 13, 1985 passed a Resolution mandating the removal of all radios from medallion taxicabs within two years. The "whereas" clauses explained the rule's rationale:

> "WHEREAS, the problem of taxicab unavailability has been severely exacerbated by the growth of medallion taxicabs radio groups in recent years whose members service radio customers thereby making their taxicab unavailable for street hails; and
>
> WHEREAS, the services provided by taxicab radio groups can be adequately performed by other licensed non-medallion vehicles operating for hire in the City.

*Taxi History*, at 6 and Exh. 3.

Since March 15, 1987, New York City medallion taxis have been allowed to accept passengers only by street hail. *Id.* at 6. Since then, assengers wishing to schedule a trip by pre-arrangement have had to contact a for-hire dispatch base.

## B. The Drivers That Affiliated With Radio Dispatch Bases Remained Independent Contractors

When radios were no longer allowed in taxis, drivers who wished to continue to work by pre-arrangement (as opposed to picking up street hails) moved from driving taxis to driving black cars. Dial Car, Inc. ("Dial") is one of many examples of the organic transition of the radio medallion taxi to the black car. Dial started in

9

1963 as a taxi company and became a black car company in 1984 after the TLC began to allow radios in non-medallion cars. UTOG Corporate Car Service Inc., too, started in 1969 as a radio taxi medallion group and is now a black car company. There are many more examples, including the former Citywide Corporation Transportation Inc. (formerly Bronx Two-Way Radio Taxi Metered Assn., Inc.), Charge & Ride, Inc. (formerly Queens Two Way Radio, Inc.), Communicar Inc. (formerly Skulls Radio), and Love Corporate Car, Inc. (formerly Love Taxi Inc.), to name a few.

The former taxi drivers who became black car drivers maintained the same relationship with black car bases that they had with the radio associations licensed by the TLC: they were owner-operators, and vis-à-vis the base were independent contractors. As in the radio days, the drivers affiliate with a Dispatch Base, which puts the driver in touch with a customer requesting a pre-arranged ride. The Dispatch Bases are organized in one of two ways:

- As a cooperative corporation in which each shareholder, by virtue of his status as a shareholder, acquires the right (via a proprietary lease) to use the services of the Dispatch Base to pick up and drop off passengers who call the Dispatch Base for service. In addition, each shareholder has all of the accompanying rights of share ownership including, but not limited to, the right to vote for directors and receive distributions; or

- As a proprietary company which sells franchises to individuals and companies. Each franchise agreement provides that the franchisees can use the dispatching services of the Dispatch Base

to pick up and drop off passengers who call the Dispatch Base for service.

The Dispatch Bases do not own, lease, or otherwise control the vehicles they dispatch. In addition to dispatching calls to drivers, they provide ancillary administrative services, including bookkeeping, billing, collection, and payment functions. As owner-operators, drivers are responsible, inter alia, for the acquisition and maintenance of their vehicles and for purchasing insurance and gasoline.

The drivers' status as independent contractors was so central to the development of the black car industry that the TLC defined the industry by that relationship, in contrast to its definitions of the livery and limousine industries. A "Black Car Base"

is a For-Hire Base that operates as follows:

(1)    All Black Car Vehicles are dispatched on a pre-arranged basis

(2)    **All Black Car Vehicles are owned by franchisees of the Base or are members of a cooperative that operates the Base;** and

(3)    More than ninety percent (90%) of the Base's business is on a payment basis other than direct cash payment by a Passenger.

TLC Rules § 59A-03(c) (emphasis added). Under New York law, in a franchise, a "franchisee" is granted

> (a) . . . *the right to engage in the business of offering, selling, or distributing goods or services* under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or (b) . . . *the right to engage in the business of offering, selling, or*

> *distributing goods or services* substantially associated
> with the franchisor's trademark, service mark, trade
> name, logotype, advertising, or other commercial symbol
> designating the franchisor or its affiliate, and the
> franchisee is required to pay, directly or indirectly, a
> franchise fee.

New York General Business Law § 681(3) (emphasis added).

In sharp contrast, the regulatory definitions of the livery and limousine businesses do not include any restriction on the nature of the economic relationship between driver and base. A "Livery Base Station"

> is a For-Hire Base that operates as follows:
>
> (1) All Livery Vehicles are dispatched from the Base on
> a pre-arranged basis.
>
> (2) All Livery Vehicles are designed to carry fewer than
> six (6) Passengers.
>
> (3) Passengers are charged for service on the basis of a
> flat rate, time, mileage, or zones.

TLC Rules 59A-03(k). A "Luxury Limousine Base"

> is a For-Hire Base that operates as follows:
>
> (1) All Luxury Limousines are dispatched from the Base
> by pre-arrangement.
>
> (2) Luxury Limousine Vehicles have a seating capacity
> of 20 or fewer Passengers.
>
> (3) More than ninety percent (90%) of its business is on a
> payment basis other than direct cash payment by a
> Passenger.

(4) Passengers are charged "garage to garage" service on the basis of a flat rate, time or mileage.

In short, the black car industry in New York City is *defined by* the drivers' legal status as independent business owner-operators. Black car drivers, unlike livery or limousine drivers, must purchase a franchise or shares in a cooperative (depending on the legal structure chosen to set up the base), in order to be dispatched by any black car base. What the drivers obtain is not employment with the Dispatch Base, but the right to participate in a radio dispatch network through which the base connects the drivers to customers—the same thing independent medallion drivers got when they joined the radio dispatch associations before 1984.

## C. Drivers Who Wish To Be Employees Can Drive For The Livery Or Limousine Industry

Drivers who wish to work for a for-hire base as employees, furthermore, are not without options. As shown above, TLC regulations do not prohibit livery and limousine bases from hiring drivers as employees. And many companies in those sectors in fact do so, including TLC-licensed limousine bases Boston Coach, London Town Car, Farrel Limousine, BLS Limousine, Davel Limousine, and Paris Limousine, and livery bases such as Mid Island Car Service. As employees of these limousine and livery companies, drivers generally are paid an hourly wage or a weekly salary, receive overtime pay, have their work schedules dictated by the employer, can be fired or laid off, and typically use a company-owned car.

13

## POINT II

## DEEMING BLACK CAR DRIVERS EMPLOYEES OF THE DISPATCH BASES WOULD DESTROY THE BLACK CAR INDUSTRY

In short, the Dispatch Bases have never "classified" or "reclassified" black car drivers as independent contractors; the drivers have been independent contractors vis-a-vis the Bases for as long as there has been a black car industry. That legal status accords with economic reality, and drivers and bases alike have built their business models in reliance on it. Now to deem the drivers employees would do more than upend the black car industry—it would overturn a relationship established more than 30 years ago, and would contradict both the regulatory structure and settled rulings of every tribunal that has considered and rejected the same arguments plaintiffs are making here.

### A. The Industry Has Relied On The Universal Recognition Of Black Car Drivers As Independent Contractors

Beginning with the TLC definitions discussed above, every regulatory standard applicable to the black car industry recognizes, either explicitly or as applied, the fact that black car drivers are independent contractors. The certainty of these legal regimes and the flexibility of the underlying economic relationship has allowed the drivers and the Bases, as New York independent business owners, to grow and flourish.

14

### 1.  New York State Department of Labor

A 2009 pamphlet prepared by the New York State Department of Labor ("DOL"), states that any driver who owns or leases his car and has made a significant investment to purchase a franchise or membership interest is an independent contractor, if the company does not exercise significant control over the driver's services.  In the words of DOL:

> Owner-drivers who have a **significant** financial investment **in addition to the cost of the car**, and are not subject to substantial direction and control, are independent contractors.  A **significant** investment would mean buying shares or a membership interest in the company, or investing in a franchise.
>
> . . . .
>
> Owner-drivers in the black car industry who make a large initial investment to purchase a franchise or membership, in addition to the cost of buying or leasing a vehicle, are true entrepreneurs, at risk for profit or loss.  Often, these independent drivers can participate in the election of officers, directors, members or committees, and committee chairpersons, and they themselves can serve on the membership committees that govern activities such as screening prospective drivers, rule making, and driver discipline.  The case precedent is <u>Matter of Pavan</u>, decided by the Appellate Division in May 1991. . . . .

*See* Limousine Drivers -- Narrative & Pointers, at 3 (Dec. 21, 2009) (emphasis in original.[3]

---

3 This document was obtained through a Freedom of Information Law request and we have been unable to find a publicly available copy.  We will be glad to provide a copy upon request.

## 2. Taxing Authorities

### a. Internal Revenue Service

The Internal Revenue Service ("IRS") has recognized that the structure of the black car industry makes its drivers independent contractors under the IRS's 1997 audit guidelines entitled *Employment Tax Procedures: Classification of Workers Within the Limousine Industry* (the "IRS Guidelines"), available at http://www.irs.gov/pub/irs-utl/limo.pdf. Dispatch Bases meet the agency's description of "dispatch service providers," and their attributes make apparent that the drivers are independent contractors under the IRS Guidelines:

> Dispatch service providers neither own nor lease vehicles. The primary business purpose of these companies is to provide a dispatch service to limousine drivers. Few companies in the limousine industry offer pure dispatch service; where they do exist they are located in major metropolitan areas.
>
> Dispatch companies concern themselves with "when and where" the driver serves the passenger; they do not concern themselves with controlling "how" the driver provides the service. The characteristics of the pure dispatch company include:
>
> - A dispatch company does not own vehicles;
>
> - The dispatch company makes or loses money based on operation of the communications system, not operation of the vehicle;
>
> - A dispatch company dispatches calls for transport among a group of unrelated limousine drivers, either companies or individuals;

16

- If one driver refuses the job (which they are free to do), the dispatcher calls the next driver on the list; and,

- The driver is not accountable to the dispatch company.

Because pure dispatch companies do not have the right to control the drivers, application of these guidelines will often show that the drivers associated with limousine companies are properly classified as independent contractors.

IRS Guidelines at 4-5.

Black car drivers and bases recognize that under the IRS Guidelines the drivers are independent contractors. Accordingly, drivers are issued 1099s, not W-2s, and file their own tax returns as independent businesses.

### b. New York State Department Of Taxation And Finance

The imposition of state sales and use taxes on black car drivers leaves no doubt that state tax laws and the agency that interprets them, the New York Department of Taxation and Finance (the "Tax Department"), treats black car drivers as independent contractors.

In 1988 the Tax Department issued an Advisory Opinion that "[d]ispatch services, commonly used by taxicab companies, trucking firms and similar operations, which provide two-way voice communication between a base location and mobile units or between mobile units are considered telephony," and

consequently the transmission (dispatch) services are subject to sales tax under Section 1105(b) of the Tax Law.  TSB-A-88(47)(S), at 2 (Sept. 13, 1988).[4]  Based on this determination, Dispatch Bases collect telephony tax from drivers for their use of dispatch services.  By contrast, employees are not charged sales or use taxes for their use of services provided by their employer.

### 3.  Workers' Compensation

As noted above, BCAC worked to develop legislation to provide black car drivers with workers compensation *exactly because* the Dispatch Bases are not the drivers' employers.  Section 2(3) of New York's Workers' Compensation Law provides that, for purposes of workers' compensation, black car drivers are employees of the Black Car Fund and *not* the Dispatch Bases:

> [The] employer of black car operator, as defined in article six-F of the executive law, shall, on and after the fund liability date, as defined in such article, be the New York black car operators' injury compensation fund, inc. created pursuant to such article.

New York Workers' Compensation Law § 2(3).

### 4.  Franchise Law  -- New York State Attorney General

The New York Attorney General treats the relationship between Dispatch Bases and their affiliated drivers as that of franchisor and franchisee.  Accordingly,

---

4 The dictionary defines "telephony" as "the use or operation of an apparatus (as a telephone) for transmission of sounds as electrical signals between widely removed points."
http://www.merriam-webster.com/dictionary/telephony.

a base that is not owned by its affiliated drivers must file an annual franchise disclosure statement, in which the base must disclose, among other things, the business risks to the franchisee and three years' worth of the base's certified financial statements. The law requires the franchisor to disclose specific financial information precisely because it recognizes that the franchisee is making an investment in a business. No employer is required to open its books to an employee.

### 5. Unemployment Benefits – Administrative and Judicial Interpretations

In the context of drivers' pursuit of unemployment benefits, the substantial majority of cases conclude that black car drivers are independent contractors, not employees of Dispatch Bases. The seminal case is *Matter of Pavan* [UTOG 2-Way Radio Assoc.], 173 A.D.2d 1036 (3d Dep't 1991), *rev'g*, A.B. 391,945 (1991), in which the court concluded that the base had "at most, 'incidental control over the means employed to achieve the results," 173 A.D.2d at 1038, while the indicia of independent contractor status were great:

> Notably here . . . the members [of the base] work at their own convenience, are free to hold outside employment, are not limited to any particular territory, are not reimbursed for expenses and receive no salary or drawing account. The fact that customer payments and complaints are delivered to UTOG is nothing more than a testament to UTOG's intended function as an intermediary between the customers and drivers. In the simplest of terms, UTOG is the instrument and not the employer of the independent limousine owners who compromise its membership. They are not subject to its

19

control; rather, UTOG is subject to their control.

*Id.*

In the 25 years since that decision, many administrative law judges and courts have reached the same conclusion. *See, e.g.*, *Matter of Nite Riders Group, Inc.*, ALJ Case No. 006-15485 (Unemployment Insur. Appeal Bd., ALJ Section 2007) (necessary level of supervision and control was absent where drivers owned their vehicles, could turn down work, were informed of but not assigned jobs, and could be instructed on route and drop off changes by customer without the consent of the base); *Matter of Arrow Transp.*, ALJ Case No. 004-18884 (Unemployment Insur. Appeal Bd., ALJ Section 2005) (driver independent contractor where "[h]e could choose when and if he wanted to work, he could hire drivers to drive his vehicle, he could work from another base if he so desired and he could refuse fares"); *Matter of Jarzabek* [Carey Limo], 292 A.D.2d 668, 738 N.Y.S.2d 742 (3d Dep't 2002) (noting same factors as well as fact that driver could refuse assignments, hire others to drive his vehicle if they met minimum standards, and sell his franchise); *Matter of Rukh* [Battery City Car & Limousine], 208 A.D.2d 1105, 617 N.Y.S.2d 547 (3d Dep't 1994) (same); *Matter of Bishai* [Tel-A-Car], 208 A.D.2d 1103, 617 N.Y.S.2d 548 (3d Dep't 1994) (same).

### 6. Tort Law -- Car Accident Context

Finally, state courts confronted with claims of *respondent superior* arising out of car accidents involving drivers that have independent relationships with bases also routinely reject the contention that the drivers are employees. *Chaouni v. Ali,* 105 A.D.3d 424, 963 N.Y.S.2d 27, 28 (1st Dep't 2013), is but one recent example. In that case, the Appellate Division held that the lower court should have granted the for-hire (in this case, livery) base's motion for summary judgment, because the driver was an independent contractor and not an employee:

> The undisputed evidence showed that Dial 7's drivers own their own vehicles, were responsible for the maintenance thereof, paid for the insurance, and had unfettered discretion to determine the days and times they worked, with no minimum or maximum number of hours or days imposed by Dial 7. Dial 7 does not require its drivers to wear a uniform nor does it have a dress code, and its drivers are free to accept or reject any dispatch as they like, can take breaks or end their shifts whenever they want, and are even permitted to work for other livery base stations. Dial 7's drivers kept a fixed percentage of all fares and 100% of all tips, and Dial 7 did not withhold taxes and issued 1099 forms, not W–2 forms, to its drivers.

The decision is consistent with extensive New York precedent. *See, e.g.*, *Barak v. Chen,* 87 A.D.3d 955, 929 N.Y.S.2d 315 (2nd Dep't 2011); *Abouzeid v. Grgas,* 295 A.D.2d 376, 743 N.Y.S.2d 165, 166 (2d Dep't 2002); *Irrutia v. Terrero & Corona Car Service Corp.,* 227 A.D.2d 380, 642 N.Y.S.2d 328 (2d Dep't 1996); *Pinto v. TWR Express Corp.,* 22 A.D.3d 481, 803 N.Y.S.2d 640 (2d Dep't 2005);

*Kuchinski v. Charge & Ride,* 21 A.D.3d 1062, 803 N.Y.S.2d 596 (2d Dep't 2005);

*Holcomb v. TWR Express, Inc.,* 11 A.D.3d 513, 782 N.Y.S.2d 840 (2d Dep't 2004).

The courts in New Jersey have reached the same result for the same reason. *See*

*Wilson v. Kelleher Motor Freight Lines, Inc.*, 12 N.J. Super. 261, 265 (1953)

(freelance truck driver who owned his own tractor trailer and was hired by radio call

for single job was independent contractor, and therefore driver's death in an accident

en route did not entitle widow to workers' compensation).

## B. The Industry's Longstanding Business Model Cannot Accommodate An Employer/Employee Relationship Between Base And Driver

The black car industry is defined by its business model, in which drivers are

business owners, not employees. The industry started that way, and has remained

that way for its more than 30 years of existence. Had the model not proven beneficial

for customers and drivers, it would not have lasted. Because the model is

fundamental to the successful operations of both the drivers and the bases, the

industry is unlikely to survive the designation of drivers as employees under the

FLSA.

### 1. Ending Drivers' Independence Will Upend If Not Destroy The Industry

A decision deeming black car drivers to be employees of the Dispatch Bases

could have either of two possible outcomes. First, if the decision were to sanction

(expressly or by implication) the reformation of existing contracts between drivers

22

and Dispatch Bases, such reformation would transform the economic reality of daily life for drivers and bases. For example:

- For the first time ever, drivers would be subject to a work schedule.

- Drivers would not be allowed to take extended time off for vacation or other personal reasons.

- Drivers would no longer be able to control the amount of money they can make, as the number of hours they work and customers they may accept would no longer be in their control. They could be paid minimum wage, and the bases would decide how many hours per week the drivers would work.

- Drivers would be subject to income tax withholding on their gross revenue.

- FICA and Medicare taxes would be withheld from drivers' salaries, and would be calculated on gross revenue rather than the lesser amount calculated on an independent contractor's net profit, as set forth on a Federal Tax Schedule C or entity tax return.

- The value of a driver's franchise, now often worth tens of thousands of dollars and for many drivers their principal asset, would decrease sharply or to zero, because it would cease to entitle the driver to own and operate a business, to receive dispatches, or anything else.

- Drivers would lose the ability to lease their vehicles to other drivers.

- Drivers would no longer be able to build their businesses by acquiring additional franchises. Currently, a single driver may field more than one car by purchasing additional franchises from or memberships in the base, which they can lease to other drivers. As an employee, a driver would not be able to operate more than the car he himself is driving.

- Drivers would lose the ability to sell their franchises on what has become an active secondary market.

23

On the other hand, if, as one district judge has suggested, the existing base-driver contracts can continue to exist in parallel with the requirements of the FLSA, the consequences to the Dispatch Bases and to their affiliated drivers would be immediate and catastrophic—since the economic viability of a black car base would be non-existent if it had to provide drivers with a salary and benefits while also allowing drivers to set their own hours and keep their gross receipts to the extent provided in their existing contracts.[5]  In such event, there would be no Dispatch Bases and consequently no employers to have employees.

The effects on drivers and bases under either scenario are intertwined and are likely to put the black car industry as it exists today out of business.

## 2.  The Drivers Will Lose Their Businesses

In proposing to intervene as defendants in a similar, now-closed FLSA action brought in 2013 in the Southern District of New York, *Anwar v. Transportation Systems, Inc.*, No. 13 Civ 2666 (GHW), a large group of black car drivers articulated the severe harm they would suffer if they were to be classified as employees for the first time ever:

The consequences of the improper classification of the

---

[5]  The view that existing contracts would remain in force even if black car drivers were to be declared employees under the FLSA was expressed by Southern District of New York Judge Gregory H. Woods at an oral argument on May 23, 2014, in *Anwar v. Love Corporate Car, Inc.*, No. 13 Civ. 2666 (GHW), a similar FLSA action brought by a group of black car drivers that is now closed.  A copy of the transcript will be provided upon request.

24

members of the Intervenor Class as "employees" would be dire. In addition to the complete deprivation of their bargained-for contractual rights, including their right to own and operate, or lease to others, their franchise businesses as they see fit, the improper classification of members of the Intervenor Class as "employees" would render their franchise businesses – in which they invested substantial time and monies – valueless, such that they no longer could sell or lease their franchises. In addition to losing their business investments, as "employees" the members of the Intervenor Class would be subject to the direction and control of the ETG Defendant Franchisors from which they purchased their franchise(s); they could no longer set their own work schedules, would have limited amounts of time off (or none whatsoever), would have to work pursuant to whatever rules and conditions might be set by the franchisor, and may not have an opportunity to make sizeable profits – since they could be forced to work for set wages and the ETG Defendant Franchisors presumably would seek to maximize their own profits by setting wages as low as possible and staggering schedules in order to minimize overtime and other business costs.

More than that, classification of members of the Intervenor Class as "employees" likely would result in substantial negative federal, state and local tax consequences. Critically, members of the Intervenor Class, who for years have filed taxes based on the fact that they own and operate their own businesses (i.e., sole proprietorships or other corporate forms), most likely would be required to amend their tax returns and consequently would owe very substantial back taxes to these taxing authorities, and would lose the valuable tax benefits they now rightfully receive as independent business owners on a going-forward basis.

Proposed Intervenor Complaint in *Anwar v. Transportation Systems, Inc.*, No. 13

Civ 2666 (GHW) at ¶¶ 9-10 (*see* docket entries 108-109).

Finally, the burden and uncertainty of being subject to parallel and incompatible legal regimes would fall on drivers and bases alike. While drivers would be employees for FLSA purposes, they would be independent contractors and franchisees in the eyes of New York and federal law for every other purpose. As shown above, the tax, regulatory and other legal requirements governing black car drivers and bases today are all premised on the independent relationship between the drivers, as owner-operators, and the bases. A ruling in this case that contradicts those settled principles and the relationships based on them would create chaos in the industry. Whether the Black Car Fund or the base would be responsible for paying workers' compensation benefits is an open question. Equally perplexing would be the consequences for regulation by the TLC, since a black car driver by definition must be *an owner*, either of a franchise or of shares in a black car base.

These harms can be avoided without destroying the business model that black car drivers and bases have relied on since the industry emerged in the early 1980s. Drivers have a choice: those who wish to function as employees with a set schedule, salary, and overtime may work for one of the for-hire bases in the livery and limousine industries that operate that way. The drivers who have purchased franchises from or shares or interests in BCAC members have knowingly chosen a different path, one that allows them to continue as the independent business owners their predecessors were when they chose to affiliate with associations through which

26

they could receive radio calls as an alternative to cruising the streets for customers.

## CONCLUSION

For the reasons stated above, *Amicus Curiae* BCAC respectfully urges the

Court to affirm the district court's judgment.

Dated:      New York, New York
             July 28, 2015


*Respectfully submitted,*

Wayne I. Baden
Elizabeth Wolstein
SCHLAM STONE & DOLAN LLP
26 Broadway
New York, NY 10004
(212) 344-5400
wibaden@schlamstone.com
ewolstein@schlamstone.com

**Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements**

1. This Appellees' brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☑ this Amicus brief contains 6,372 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this brief has been prepared in a proportionally spaced typeface using MS Word in 14 point Times New Roman.

Dated: July 28, 2015

_____ /s/ _____
Wayne I. Baden
Elizabeth Wolstein
SCHLAM STONE & DOLAN LLP
26 Broadway
New York, NY 10004
(212) 344-5400
wibaden@schlamstone.com
ewolstein@schlamstone.com